[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff wife, 43, whose birth name is Norwood, and the defendant husband, 41, married on Sept. 6, 1986 in Washington D.C. Both are college graduates and both enjoy reasonably good health. The parties moved to this state in 1989 and have continued to reside here continuously since then thereby providing this court with jurisdiction over the dissolution action brought up by the plaintiff by summons and complaint on April 12, 1999. They have three children: Christopher, Jr. born March 10, 1989, Emma, born December 3, 1991 and Grace, born February 19, 1996. When married the plaintiff had been pursuing a career as a professional actress and as a model for five years in New York City. The defendant was then a sales representative for Xerox. The plaintiff continued to work until the birth of their oldest child when the plaintiff became a full-time mother and homemaker. They moved to Darien to a rental for a year and then purchased their first home, obtaining the down payment from the defendant's father who loaned them $25,000 which they later paid back. The property cost $210,000. In July, 1992 they purchased their current marital home for about $475,000 utilizing the proceeds from the sale of the initial house which sold for $280,000. About three years ago they put a second mortgage on to pay for an additional bedroom and other improvements. The marital home, 1 Tanglewood Trail, Darien, is valued at $900,000 subject to a first mortgage balance of $325,600 and a second mortgage balance of $300,300. CT Page 15844
The defendant became employed as vice president of sales by PORT, Inc. in January, 1993 where he remained employed until earlier this year when he resigned with a severance package, the final payment for same due on January 2, 2001 in the amount of $94,128.54 gross and, after estimated tax liabilities thereon of 40%, an expected net of $56,477 as stated on his revised financial affidavit dated and filed on November 16, 2000. He is currently performing consulting services for FollowUp.Net on a part-time as needed basis earning fees of $100 hourly, listing $1500 gross earnings monthly and $1050 after taxes. In 1999 the defendant estimated that he earned about $200,000 from his employment. When this trial began on October 20th he had not filed his 1999 income tax returns. The court has concluded that he has not aggressively sought full time employment since his discharge. The defendant has a proven record of success in sales.
The plaintiff's financial picture, as painted by her financial affidavit filed on October 20, 2000, lists no income, monthly expenses totaling $15,337, assets consisting of 50 percent of the equity in the marital home listed as $136,368.31, a 1990 Volvo station wagon valued at $5000 with plaintiff's 50 percent interest listed at $2500, a 1997 Chevrolet Suburban listed at $18,000 with plaintiff's 50 percent interest listed at $9000, and household furnishings assigned "value undetermined"for a total of $147,868.31. The plaintiff lists liabilities to Citibank Visa of $4000, Hazelden of $13,451, Greenwich Hospital $542, Geriatric Association of $500, Stamford Hospital of $680, and legal fees of $7500 for a total of $26,673.
The defendant's financial picture, as painted by his financial affidavit dated November 16, 2000 lists monthly expenses of $19,900, his 50 percent interest in the marital home $137,033, a Chase Manhattan Bank checking account containing $39,000, his 50 percent interest in the 1990 Volvo listed as $2000, his interest in the 1997 Chevrolet Suburban listed as $12,500, a 1981 Mako 228 boat listed as $11,500, a Targus/PORT 401k listed at $84,400, an IRA Charles Schwab listed at $3000, jewelry and silver jointly owned, valued at $38,000 with defendant's interest listed as $19,000, house furnishings valued at $32,000 with his interest listed at $16,000 for a total of $324,433. Also listed is life insurance written by Mass. Mutual with a face value of $1 million dollars, no cash value, listing plaintiff as the beneficiary. The defendant lists liabilities of 1999 taxes due of $20,000, First USA Visa $15,850, Citibank Visa $3000, Ray Finlay $18,000 and legal fees of $5,000, for a total of $61,850. The defendant and his five siblings have the use of a Nantucket house each summer that is owned by their father. During the pendency of this action both parties spent assets in support of their respective lifestyles as well as for therapy, legal expenses and other related expenses to the litigation. The court will not attempt to audit the parties' financial CT Page 15845 activities in this respect for the money is gone, a goodly amount for legal fees.
The breakdown of the marriage was caused primarily by the activity of the defendant who engaged in an affaire de coeur with a married woman that began in November, 1998. The plaintiff discovered the liaison two days after Easter Sunday, 1999 and when questioned by her the defendant admitted carrying on the affair. He left the family home that day and never returned. While vacationing in Hawaii the previous January her suspicion had been aroused by the cessation of intimacy on his part. When questioned he denied having an affair. There was an earlier separation that occurred about the time that the plaintiff was pregnant with Emma when the defendant moved to his parents' home for a month as a result of an episode that occurred with a woman he met at a bar. The defendant's admission caused the plaintiff, in her words, to be "leveled emotionally". The defendant testified that the plaintiff drank alcoholic beverage to excess with some regularity and frequently was abusive toward the defendant. He testified to being locked out of his home on six or more occasions after he left to avoid further argument. Events that occurred subsequent to the final separation lend credence to the defendant's claim that the plaintiff had been abusing alcohol for some time. She was arrested for D.U.I. and lost her licence for six months. She became an inpatient at the Florida branch of Hazelton Rehab, Minn for 28 days and for 10 additional days as an out-patient. She currently attends AA meetings and remains sober. Although she deserves credit for conquering her sickness the fact remains that the court concludes that her prior behavior also contributed to the marriage breakdown but certainly not to the extent that the defendant's infidelities did.
The parties have agreed on custody and related issues and have executed a written "Parenting Agreement" (205) dated November 29, 2000 which the court accepts, approves and will order as part of the final judgment.
The court, having reviewed the evidence in light of the relevant statutes and case law, enters the following decree.
 1. Judgment is entered dissolving the marriage on the ground of irretrievable breakdown and each party is declared to be unmarried. As part of the judgment the following orders are entered.
 2. The Parenting Agreement dated November 29, 2000 is hereby adopted as the orders of the court regarding custody and visitation, a copy of which is annexed hereto and incorporated herein as part of this judgment.
CT Page 15846
 3. The defendant shall pay to the plaintiff the sum of $4000 per month as unallocated alimony and support based on the defendant's present circumstances. He is ordered to notify the plaintiff within seven days of obtaining full-time employment. The current order shall terminate upon the death of either party, the remarriage of the plaintiff; and upon future court order based on the oldest child attaining majority and graduating from high school as per statute or upon future court order based on Sec. 46b-86 commonly referred to as the cohabitation statute. The court enters the unallocated order as a deviation from the guidelines based on total family support. A wage withholding order is entered as required.
 4. The defendant shall provide medical insurance for the minor children at his expense and he shall be responsible for any uninsured medical bill balances or deductibles under the present circumstances while the plaintiff remains unemployed. Sec. 46b-84(e) shall apply to this order
 5. The defendant shall provide and maintain in force life insurance in the face amount of $500,000 naming the plaintiff as trustee for the minor children. Such policy or policies shall remain in effect until all minor children have attained 18 years of age and graduated from high school. The defendant may reduce coverage by $100,000 after each child attains majority and graduates from high school and may eliminate the coverage after all minor children have done so.
 6. The defendant shall quitclaim all of his interest in One Tanglewood Trail, Darien, Connecticut and the plaintiff assume sole responsibility for the mortgages and shall hold the defendant harmless and indemnified. If the defendant fails to convey as provided the transfer may be made per the relevant statutes. The plaintiff is awarded the contents of the premises as her sole property.
7. The plaintiff is awarded sole ownership of the CT Page 15847 1997 Chevrolet Suburban.
 8. The defendant is awarded sole ownership of the 1990 Volvo and the 1981 Mako boat.
9. The plaintiff is awarded 50% of the defendant's PORT 401k.
 10. The plaintiff shall be solely responsible for the liabilities listed on her financial affidavit.
 11. The defendant shall be solely responsible for the liabilities listed on his financial affidavit with the exception of the Citibank Visa which he shall pay to plaintiff $2000 as his share of the bill, such payment to be made on or before January 15, 2001.
 12. The defendant shall pay, from his final severance payment, the balance due to the attorney for the minors and shall pay to the plaintiff the sum of $7500 as an allowance to prosecute to defray her litigation expenses.
The attorney for the plaintiff is directed to prepare the judgment file, quitclaim deed and any other supporting papers necessary to effect this judgment.
HARRIGAN, J.
 PARENTING AGREEMENT
AGREEMENT made this 29 day of November, 2000, by and between CATHERINE HOPE FINLAY, of Darien, Connecticut, hereinafter referred to as the "Mother", and CHRISTOPHER FINLAY, of Darien, Connecticut, hereinafter referred to as the "Father".
 WITNESSETH:
WHEREAS, the Mother and the Father were intermarried at Washington, DC on September 6, 1986, and there are three minor children issue of the marriage, namely: Christopher Finlay, Jr., born March 10, 1989; Emma Finlay, born December 3, 1991; and Grace Finlay, born February 19, 1996: and
WHEREAS, irreconcilable differences have arisen between the parties, as CT Page 15848 a result of which they have separated and have for some time lived separate and apart and intend to continue to live separate and apart; and
WHEREAS, the Mother has instituted an action against the Father claiming a dissolution of marriage and other relief; which action is now pending in the Superior Court for the Judicial District of Stamford/Norwalk, State of Connecticut, bearing Docket No. FA-99-0171658-S; and
WHEREAS, this Agreement is made and intended for the purpose of settling between the parties hereto all of the issues relating to custody, residence, decision-making and responsibility for the children of the parties.
NOW, THEREFORE, in consideration of the premises and the mutual promises and undertakings herein contained and set forth, and for other good and valuable consideration made over by each party to the other, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:
ARTICLE I
PARENTING ARRANGEMENTS
1.1 The Mother and the Father shall have joint legal custody of the three minor children. The children's principal residence shall be with the Mother.
1.2 The Father shall have parenting time with the children at such times as the parties agree, and in the absence of an agreement to the contrary, according to the following schedule:
 (a) During the minor children's school year, every other weekend,* beginning on Friday at 4:30 p.m. and ending on Sunday at 7:30 p.m. The Father shall provide the evening meal for the children on Friday and the Father shall provide the evening meal for the children on Sunday. If there is a legal holiday on Friday or Monday of a weekend that the children are to spend with the Father, the Father's weekend shall include the holiday and the children visit with the Father Thursday starting at 6:00 p.m. or returned by the Father on Monday evening at 6:00 p.m.
CT Page 15849
 (b) On one of the intervening weekends (on a four week calendar, the third and fourth weekend), the Father shall have the children from Saturday at 4:00 p.m. to Sunday at 7:30 p.m.
 (c) On the second intervening weekend, there shall be no access to the Father, except by agreement of the Mother.
 (d) The Father shall also spend parenting time with the children every Wednesday, at 3:00 p.m., or after camp until 7:30 p.m. The Father shall spend parenting time with the children on Wednesdays at 3:00 p.m. until he becomes employed full time. The parties will work cooperatively to arrange for suitable child chare for the children from after school to 5:00 p.m. once the Father is employed on a full time basis, and the Father will make suitable child care arrangements in the event he is on a business trip. The Father shall be responsible to oversee the children's homework on Wednesdays, and to provide the evening meal for the children. In the event that the Father cannot make the Wednesday visitation, he will give the Mother prompt notice of this fact, by not later than 5:00 p.m. on the Tuesday preceding the scheduled visit.
 (e) During the summer, the Father shall have 3 out of 4 weekends, seriatum from Friday at 4:00 p.m. to Monday at 9:00 a.m. In addition, the Father shall have visitation every Wednesday from 3:00 p.m., or after camp, whichever is earlier, until Thursday morning at which time he shall either take the children to their respective camp programs or other regularly scheduled activities, or return them to their home at 9:00 a.m. In the event that the Father cannot make the Wednesday visitation set forth in this paragraph, due to business commitments only, he will make suitable child care arrangements for the children in his absence by hiring a babysitter known to the children to baby sit for the children during their CT Page 15850 regularly scheduled Wednesday visitation time. The Father shall provide the Mother with at least twenty-four hours notice as to the name and phone number of said babysitter, and the Father shall be responsible for paying the babysitter for her services directly. The babysitter shall baby sit for the children in the Mother's home. In no event, however, shall the Father be entitled to any visitation in the Mother's home during any Wednesday evening that he elects to retain a babysitter in his absence.
 (f) If either parent wants to deviate from the foregoing schedule for weekend parenting time, they hereby agree to request such deviation from the other parent at least 48 hours in advance. Each parent shall make a reasonable effort to accommodate the other parent's request. In the event such accommodations are not possible, the parent requesting the deviation shall make alternate arrangements for the children at his or her own expense.
 (g) Notwithstanding the foregoing, when a parent must be absent from the children either overnight or for significant periods (3 hours or more) during weekends when that parent would otherwise be responsible for the children, he or she shall offer the other parent, in writing or by e-mail, the opportunity to care for the children before engaging other child care. In no event, however, shall either parent leave the children unattended or unsupervised. However, the parties agree that the minor children can be left alone for up to sixty minutes so that the Mother can attend her AA meetings.
 (h) The parents agree to alternate the February and April school vacations, with the Father having parenting time with the children during the April vacation in 2001, and the Mother having parenting time with the children during the February school vacation in 2001. For purposes of the parenting schedule, school vacations CT Page 15851 shall be defined to include the school days of the child's vacation, including Saturday through the following Sunday. The February and April school vacations shall include the weekends at the beginning and the end of the vacations from Friday at 4:00 p.m. to Sunday at 7:30 p.m.
 (i) Each of the parties shall have one week vacation with the minor children during the summer. The parties shall share their respective rights to select the last two weeks in August, subject to written notice. The Wife shall be entitled to the second to last full week of every August from Friday at 5:00 p.m. to the following Saturday at noon. The Husband shall be entitled to the last full week of every August from Saturday at 2:00 p.m. to the following Sunday at 7:30 p.m. The Husband shall give notice to the Wife by certified mail, return receipt requested, no later than March 1St each year of the week he selects. However, either party is free to select any other week.
 The Wife shall give the Husband notice in writing, return receipt requested, no later than March 1St of each year as to the week she selects. For the purpose of this paragraph, a week shall run from Friday at 4:00 p.m. until the following Sunday at 7:30 p.m. unless otherwise agreed by the parties.
 (j) Thanksgiving parenting time shall start at the close of school on the Wednesday before Thanksgiving and continue until 7:30 p.m. the Sunday evening after Thanksgiving. The parents shall alternate the Thanksgiving holiday each year, with the children spending Thanksgiving 2000 with the Mother. In addition, the parties shall alternate Easter Sunday. The children shall spend Easter Sunday 2001 with the Father. Easter parenting time shall start at 8:30 a.m. on Easter Sunday until 6:00 p.m. on Easter Sunday.
(k) Christmas parenting time shall be shared as CT Page 15852 follows:
 The children shall spend from after school at the start of their school Christmas vacation until Christmas Day at 12:00 noon with the Mother in 2000, and from 12:00 noon on Christmas Day until New Year's Day, 2001 at 6:00 p.m. with the Father. Each year thereafter the parents shall alternate this schedule.
 (l) Both parties acknowledge that time is of the essence with respect to both pick up and drop off times, and consistent violation of this paragraph shall be the basis for a modification of visitation.
 (m) The Father agrees that all expenses incurred during his parenting time with the children shall be his sole responsibility without credit or deviation from any child support ordered by the court. The Mother agrees to send the children to the Father with sufficient clothes and sporting equipment for the visitation. The Father agrees to return the clothes and sporting equipment at the end of the visitation.
1.3 Notwithstanding the foregoing schedule, the children shall spend Mother's Day with the Mother, and Father's Day with the Father. Mother's Day and Father's Day access times shall commence at 5:00 p.m. the night before, and shall continue through the balance of the weekend
1.4 To the fullest extent possible, the parties shall exert every reasonable effort to promote free access and unhampered contact between the children and each of the parties, and to foster a feeling of affection between the children and the parties hereto. Each party shall exert his and her best efforts to refrain from doing anything to estrange the children from the other party or to injure the opinion of the children as to their mother or father, or to act m such a way as to hamper the free and natural development of the children's love and respect for the other party. Neither party shall disparage the other party to, or in the vicinity, of the children. Any and all decisions affecting the health, welfare, education, guidance, discipline or any other aspect of the upbringing of the children shall be made with the participation, CT Page 15853 involvement and agreement of both parents. The party with whom the children are residing at the time will have the right to make all of the day-today decisions affecting the children.
1.5 Both of the parties shall be entitled to complete and full information from any physician attending the children for any reason and from any teacher or school giving instruction to the children. The children shall continue to be known by the Father's surname, and the terms "mother" and "father" will be used to refer only to the parties. Neither party shall have the right to have the children adopted by a new spouse. In the event of the death of one of the parties, the surviving parent will be the guardian of the children, and neither party shall make a Last Will and Testament inconsistent with this provision.
1.6 Each of the parties agrees to keep the other reasonably informed at all times of the children's whereabouts, including the phone number at which the child can be reached. If either party plans any trip or vacation with any child for longer than two (2) days' duration, that party shall notify the other of an itinerary of travel plans, including the duration of the trip and the address and phone number, airline flight numbers, if applicable, departure and arrival times and destination. The parties agree that, if either has knowledge of any illness or accident affecting the health or welfare of the children, the Mother or Father, as the case may be, shall promptly notify the other and permit reasonable visitation with the children during any time of their illness or injury.
1.7 The parties decided during their marriage to raise the children as Episcopal. Both parties shall take the children to their respective religious education programs during their parenting time. Each parent specifically agrees to encourage appropriate religious experiences, including attendance at church on religious holidays.
1.8 Both parents shall have the right to attend school and public events in which the children participate or which are related to the children, such as games and practices, school programs, parent/teacher conferences, church events, recitals, etc. Each of the parents shall inform the other of any such event as soon as they are scheduled. When such events occur, the parent responsible for the child involved must arrange for transportation to the event, even if the parent does not intend to be present for the activity, unless the other parent volunteers to do so. The children shall be free to interact with both parents at these events.
1.9 Both parents shall have reasonable daily telephone contact with the CT Page 15854 children when they are with the other parent, consisting of no more than two telephone calls to the children per day. consistent with the preceding sentence, the Father shall have reasonable telephone access to the children between the hours of 7:30 a.m. and 7:30 p.m. daily. The Father shall call the children on the children's line (203-655-9084), and not the Mother's home telephone or cell phone, unless there is an emergency involving the children. The Mother shall ensure that the children's line is available for incoming calls daily between 7:30 a.m. and 7:30 p.m., and ensure that an answering machine is available to take messages at all times. The Mother will hook up the cable internet service, so that the internet is no longer accessed through the children's telephone line, within a reasonable period of time. The Father shall ensure that he has an operating answering machine at his residence at all times when the children are visiting with him. Each parent shall be entitled to speak with each child one time per day, except in the event of an emergency or other extraordinary circumstances when more frequent calls may be appropriate.
1.10 The parents agree to make every reasonable effort to live within approximately thirty miles of Darien, Connecticut, in order to facilitate the implementation of this parenting plan. In the event that either parent desires to relocate beyond this thirty mile range, they agree to provide 120 days written notice by certified mail, return receipt requested, to the other parent of such relocation and to make every reasonable effort to adjust the foregoing schedule to meet the needs of the children and both of the parents.
1.11 The Mother and Father agree that the minor children, Chris and Emma, shall continue to treat with Dr. Elliot Zelevansky of New Canaan, concerning issues relating to integrating the children's needs with the development of new social relationships with both parents. Each party shall cooperate in the scheduling of appointments and transporting of the children to Dr. Zelevansky. The parties agree that the unreimbursed portion of Dr. Zelevanksy's fees shall be split equally between the parties.
1.12 If any dispute shall arise between the parties concerning the children, the Mother and Father agree that they shall mediate with Dr. Elliot Zelevansky prior to filing any motions in court. If either party disagrees with Dr. Zelevansky's decision on the matter, that party may apply to the Superior Court for the Judicial District of Stamford/Norwalk at Stamford for determination of the issue The parties shall execute such waivers and releases as may be required by Dr. Zelevansky. Dr. Zelevansky's recommendations shall CT Page 15855 be privileged and shall not be disclosed unless a waiver is made by both parties.